866 F.2d 717
 13 O.S.H. Cas.(BNA) 1913, 13 O.S.H. Cas.(BNA) 2007,
1988 O.S.H.D. (CCH) P 28,337,
1989 O.S.H.D. (CCH) P 28,429
NATIONAL GRAIN AND FEED ASSOCIATION and Great River Grain
Corporation, Petitioners,
v.
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, Respondent.
FOOD AND ALLIED SERVICE TRADES DEPARTMENT, AFL-CIO, et al.,
Petitioners,
v.
Ann D. McLAUGHLIN, Secretary of Labor, Respondent.
 Nos. 87-4960, 88-4256.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 27, 1988.
As Amended Jan. 24, 1989.
 
 Jerome J. Reso, Jr., H. Sloan McCloskey, New Orleans, La., for Nat. Grain and Feed Ass'n.
 Mike Miller, Fargo, N.D., Marc L. Fleischaker, V. Daniel Palumbo, Washington, D.C., for amicus curiae, North Dakota Grain Dealers Assoc.
 Randy S. Rabinowitz, Washington, D.C., for intervenor the Food & Allied Service Trades.
 Barbara Werthmann, Jay S. Bybee, U.S. Dept. of Labor, Leonard Schaitman, Washington, D.C., for Occupational Safety and Health Admin.
 W. Caffey Norman, III, Robert H. Myers, Jr., Washington, D.C., for Millers' Nat. Federation.
 Randy S. Rabinowitz, Washington, D.C., for Food and Allied Service Trades Dept., AFL-CIO.
 David C. Vladeck, Public Citizen Lit. Group, Alan Morrison, Washington, D.C., for intervenor--Oil, Chemical & Atomic Workers.
 Richard L. Frank, Philip C. Olsson, Washington, D.C., for intervenor--American Feed Ind. Assoc.
 Marc L. Fleischaker, Washington, D.C., for intervenor--Nat'l Grain & Feed Assoc.
 Ray H. Darling, Exec. Secretary, OSHRC, George R. Salem, Deputy Sec., Dept. of Labor, Jay S. Bybee, U.S. Dept. of Justice, Civil Div. Leonard Schaitman, Washington, D.C., for Ann McLaughlin.
 Petitions for Review of a Final Standard Issued by the Occupational Safety and Health Administration.
 Before GARZA, WILLIAMS, and SMITH, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 In December 1987, the Occupational Safety and Health Administration (OSHA), exercising its authority and responsibility under section 6 of the Occupational Safety and Health Act ("OSH Act" or the "Act"), 29 U.S.C. Sec. 655, promulgated a new standard designed, in relevant part, to eliminate or reduce the substantial risk of fires and explosions in the nation's grain-handling facilities.[1] In these consolidated petitions, parties representing both labor-union and industry interests challenge the new standard, particularly the scope of one of its provisions that requires grain elevator operators to initiate clean-up procedures whenever grain dust accumulations reach a depth of 1/8 inch in certain "priority areas" of the facility.
 
 
 2
 The unions[2] contend that the 1/8 -inch "action level" provision does not go far enough to protect workers: It should extend beyond priority areas to encompass the entire facility, and it should be mandated not only for grain elevator operators but for grain mills as well. Intervenors representing grain mill operators[3] have countered with briefs supporting the Secretary's decision not to subject grain mills to the action level. The grain elevator operators--or industry petitioners[4]--argue that the action level is unwarranted because its benefits cannot justify its costs, because it cannot be shown to reduce a substantial risk, and because its costs would cause the industry widespread economic dislocation.
 
 
 3
 Finding that the record does not contain substantial evidence to support either (i) OSHA's economic-feasibility determination or (ii) its decision not to mandate a facility-wide action level for grain elevators, we remand for further consideration on these points. In all other respects, we deny the petitions challenging OSHA's grain-facilities standard.
 
 
 4
 I. Background.
 
 
 5
 Fires and explosions in grain-handling facilities have been documented for almost two centuries, although such occurrences probably date back to even earlier times, when structures for storing grain in large quantities were first developed. Only recently, however, has come the impetus for systematic investigation and prevention of these disasters. During an eight-day period beginning on December 21, 1977, and ending on December 28, a series of devastating explosions left 59 dead persons and 48 injured. 52 Fed.Reg. 49,592 (1987). Moved by the 1977 catastrophes, numerous government agencies, including OSHA, the National Institute for Occupational Safety and Health (NIOSH), and the Department of Agriculture (USDA) responded to the hazards of grain storage.
 
 
 6
 OSHA, in particular, took several steps. First, it issued a Grain Elevator Industry Hazard Alert and provided free on-site consultation services. 49 Fed.Reg. 997 (1984). It also attempted, albeit with only limited success, to enforce the general-duty clause in section 5 of the OSH Act, 29 U.S.C. Sec. 654(a)(1), and OSHA's general industry housekeeping regulations, as a means to move the industry toward safer practices.[5] Industry, however, vigorously resisted these enforcement efforts, and employers generally were successful in arguing that OSHA had not proved that the specific condition cited could cause a fire or explosion.[6]
 
 
 7
 Another step taken by OSHA in 1978 was to commission studies of the causes and prevention of grain elevator fires and explosions. Commissions went to the National Academy of Sciences (NAS) and to Charles Kauffman, Ph.D., and Robert Hubbard, former Vice President of Cargill. In addition, USDA and NIOSH contemporaneously conducted their own studies of worker safety in grain elevators and mills. 52 Fed.Reg. 49,592-93 (1987).
 
 
 8
 The reports issued by the NAS, NIOSH, Kauffman and Hubbard, and the USDA were essentially consistent. All recognized that a grain elevator explosion is the result of a concatenation of[7] four essential elements: (1) grain dust must collect in the elevator; (2) the grain dust must be suspended in air inside the elevator at a concentration above the lower explosive limit (L.E.L.)[8] ; (3) the suspended grain dust must be ignited; and (4) sufficient grain dust to sustain rapid combustion must be in the vicinity of the initially-ignited grain dust.
 
 
 9
 Thus, if the interior of a facility is dusty, a primary or initial explosion that causes only relatively slight damage can shake loose a large, suspended dust cloud. Ignition of this fuel supply by hot dust particles or flame from the primary explosion can then cause a secondary explosion, a series of successively more violent explosions. Pressure waves preceding the flame fronts disperse static dust accumulations into the atmosphere, making even greater amounts of dust available to fuel the flame fronts. This activity has been likened to the expanding ripples that occur on the surface of a still pond after a pebble is tossed into it.
 
 
 10
 Secondary explosions cause the vast majority of injuries and deaths, because they tend to be much more severe than primary explosions. 52 Fed.Reg. 49,59 2 (1987). Of the major grain elevator explosions occurring between 1979 and 1981, secondary explosions accounted for 96 percent of the property loss, 85 percent of the fatalities, and 91 percent of the injuries.
 
 
 11
 Even relatively small amounts of layered dust can create dust clouds sufficient to cause an explosion, and the more dust that is present, the greater the hazard. The USDA has found, for example, that accumulations as low as 1/16 inch can initiate a primary explosion, and "[t]he more dust present, the greater the chance of ignition." NIOSH found that a dust layer 1/64 inch deep in an enclosure 10 feet in height can create a dust cloud above the LEL when uniformly dispersed. NAS noted that "if accumulations of dust are visible, the elevator has a potential explosion problem. The thicker the layer of dust, the greater are both the possibility of an explosion and the severity of the resulting damage."
 
 
 12
 Any movement or handling of grain produces grain dust, and this occurs at each point in the grain-handling system from farm to ultimate consumer. In a grain elevator, numerous activities subject the grain to mechanical stress leading to the production of grain dust. Grain is delivered to an elevator by truck, rail, or barge, and is dumped into a pit that feeds a conveyor belt leading to the "boot," which is called the bottom of the leg. The leg is an enclosed vertical, endless-belt bucket conveyor that elevates the grain and discharges it into the top of a garner, or collection bin, in the elevator "head."
 
 
 13
 Grain is discharged from the bottom of the garner into a scale bin for weighing. Afterwards, the grain is made to flow out of the bottom of the scale bin onto a belt conveyor that drops the grain, up to 100 feet, into a bin or silo. Grain is later conveyed back into the bottom of the leg, where it may be re-elevated for mixing and redistributed into a silo, or loaded for shipment. Typically, the grain is elevated in the leg and dropped into the silo at least twice.[9]
 
 
 14
 Grain dust does not remain forever airborne but tends to settle on nearly every horizontal surface in the facility, hidden or exposed. Accumulations near the leg are by far the most hazardous, as they contain so many potential ignition sources. As one expert observed, "[i]t is the one piece of equipment with an environment of suspended dust that is continually subject to 'choking' (boot fills with grain and buckets will not turn), electrical faults, bearing failures, mechanical misalignments, ingestion of foreign material, etc." NAS Report at 46.
 
 
 15
 All of the studies of grain-handling hazards concluded that comprehensive dust control is central to the control of fires and explosions. Kauffman and Hubbard concluded that 11 of the 14 secondary explosions they studied could have been prevented by a good housekeeping program, and that two were attributable to improper installation of the dust-control system. NAS explained that given the impossibility of eliminating all the elements for grain dust explosion, "there is no single, simple process for preventing explosions." Nevertheless, NAS rated dust control as a first priority for an effective response to the problem:
 
 
 16
 The possibility of dust suspension in concentrations above the lower explosive limit in open areas of an elevator cannot be ignored but can be reduced with relative ease. Layered dust in open work areas and hidden spaces can be reduced to a less hazardous amount through proper housekeeping. Ignition sources cannot be eliminated totally but the probability of their causing an explosion can be reduced.
 
 NAS Report at 31.[10]
 
 17
 Similarly, the NIOSH report concluded that "[g]ood housekeeping is probably the single most important factor in reducing the risks associated with secondary grain dust explosions...." When possible, dust should be cleaned up whenever visible tracts are recognized. The housekeeping program should address hidden, as well as visible, dust. NIOSH recommended that housekeeping should keep layered dust below 1/8 inch, even though that is the minimum depth visible to the human eye.
 
 
 18
 In February 1980, OSHA published an Advance Notice of Proposed Rulemaking ("ANPR"), requesting data and comment on present practices in the grain-handling industry, available control technology, and the likely economic impact of a comprehensive grain-handling standard. 45 Fed.Reg. 10,732 (1980). With a view to the span of operations from farmer to consumer, OSHA requested comments on the extent to which a standard should embrace all sectors of the grain-handling industry. In addition, OSHA sought comment on the amount of grain-dust accumulations that should be considered excessive. Id. at 10,734.
 
 
 19
 Based upon the ANPR comments, the NAS reports, and other materials, OSHA drafted a proposed rule which it circulated to employers, unions, and other interested parties in December 1982. This draft proposal covered all milling operations and all grain elevators, except those on farms. It set out a comprehensive fire and explosion control system closely patterned after NAS's first-priority recommendations.
 
 
 20
 The system included employee training, routine preventive maintenance, engineering controls, foreign object screens, and a housekeeping program that required dust cleanup whenever accumulations averaged 1/8 inch over a 200-square-foot floor area anywhere in the facility. After incorporating industry and union comment, OSHA transmitted a draft proposed rule to the Office of Management and Budget (OMB) pursuant to Executive Order No. 12,291, 3 C.F.R. Sec. 127 (1981), reprinted in 5 U.S.C. Sec. 601 note at 431 (1982).[11]
 
 
 21
 In response, OMB questioned whether, in light of recent industry safety practices, there was a need for a standard, and whether OSHA's draft standard would have the safety benefits OSHA sought. OMB urged OSHA, in any event, to exempt mills and small elevators from any standard and to eliminate the 1/8 -inch action level housekeeping provision, or at least to offer two alternatives to it: a once-per-shift cleaning, or installation of pneumatic dust collection systems.
 
 
 22
 In January 1984, OSHA published a proposed rule. 49 Fed.Reg. 996 (1984). The housekeeping requirement provided that employers must
 
 
 23
 develop and implement a housekeeping program consisting of a dust control and removal method or combination of methods which will minimize fugitive grain dust accumulations inside grain handling facilities on ledges, floors, equipment, and other exposed surfaces.
 
 
 24
 Id. at 1009. Consistent with OMB's recommendations, the proposed standard further required that, as part of the housekeeping program, employers do one of three things: (1) undertake dust control when dust reached an action level of 1/8 inch averaged over a 200-square-foot area; (2) establish a once-per-shift cleaning; or (3) install a pneumatic dust control system. Id.[12]
 
 
 25
 The proposed rule generated 5,000 comments, 11 days of hearings, and numerous submissions of data, as well as post-hearing comments and briefs. 52 Fed.Reg. 49,594 (1987). A number of participants questioned the need for any standard, arguing that the industry was dealing with the problem effectively on its own, and that the likely benefits of the proposed standard would be minimal. Other parties objected to the scope of the proposed standard, urging that milling and processing operations be excluded from coverage entirely because operational differences between grain elevators and grain-milling facilities made a single standard inappropriate. These commentators pointed to the fact that slower, smaller milling operations produce less dust, and that the feed additives and other processing features unique to milling have a fire-retardant effect that significantly reduces the risk of explosion.
 
 
 26
 OSHA also received numerous comments urging it to exempt small elevator facilities, or "country elevators," from the standard entirely or, at a minimum, to establish postponed compliance dates for such facilities. These participants generally relied upon data showing fewer fires and explosions in country elevators, and showing that small elevators would bear a compliance cost grossly disproportionate to the risk they created. Id. at 49,599.[13]
 
 
 27
 None of the participants in the rulemaking contended that housekeeping was unnecessary, although many challenged specific aspects of the housekeeping requirements. In particular, participants opposed the requirement (49 Fed.Reg. 1009 (1984)) that the housekeeping plan "minimize" dust accumulations, arguing that the language appeared to mandate expensive pneumatic dust-control systems. Some participants also faulted the action-level concept on the grounds that (1) the cost of compliance was not rationally related to any benefit, since even 1/8 -inch accumulations present a hazard; (2) the 1/8 -inch concept would create a false sense of security; and (3) it failed to direct attention where it was most needed--areas near and around known potential ignition sources.
 
 
 28
 II. The Final Standard and Its Rationale.
 
 
 29
 On December 31, 1987, OSHA promulgated a final standard for grain-handling facilities. 52 Fed.Reg. 49,592 (1987). The agency found that although industry had undertaken research and education initiatives since the 1977 disasters, explosions and fires continued to occur in grain facilities and, therefore, regulatory action was warranted. OSHA noted that in 1985 alone, 22 explosions had occurred, resulting in four deaths and 20 injuries. Id. at 49,594-95.[14]
 
 
 30
 The standard addressed these hazards with a system of integrated safety practices, employee training, and engineering controls. OSHA estimated that full compliance with the standard would result in approximately a 75-percent reduction in grain fires and explosions, and a 50-percent reduction in the severity of the remaining incidents. Id. at 49,622.
 
 
 31
 Of the four elements necessary for fires and explosions in grain facilities--air, confinement, fuel (grain dust), and ignition--OSHA determined that control of only ignition sources and dust would be feasible. As OSHA's expert, Dr. C.W. Kauffman, noted at the hearings:
 
 
 32
 Air is ubiquitous and the scale of required inerting would be quite large.... [C]onfinement can be dealt with most easily during construction of a facility.
 
 
 33
 We know what to do, we know why the explosions occur, and it's simply a question of taking care of these ignition sources and the dust available.
 
 Id. at 49,595.[15]
 
 34
 Accordingly, the standard mandates a series of controls to reduce sources that might ignite a grain fire or explosion: Tramp metal and other foreign objects capable of producing friction sparks or machine defects must be eliminated from the grain stream at the receiving pit, and again before the grain enters the processing equipment. 29 C.F.R. Sec. 1910.272(j), (m). Regular preventive maintenance is required for all grain-facility machinery, and the bucket elevator head and boot must be accessible for maintenance, inspection, repair, and cleanup. Grain dryers in elevators must be capable of automatic shutoff, and any new dryers must be located outside the grain elevator or be protected by an explosion suppression system or surrounded by fire-resistant walls. Id. Sec. 1910.272(l ), (p)(3). The bucket conveyor must be equipped with monitors that will shut down the bucket elevator in the event of malfunction. Id. Sec. 1910.272(p)(5).
 
 
 35
 In addition, no hot work--such as welding or torch-cutting--is permitted within any grain-handling facility except under the direct supervision of an employer representative or with a specially-issued permit. Id. Sec. 1910.272(f). Jogging[16] to free a choked leg is prohibited. Id. 1910.272(p)(1). Bearings inside elevator legs must be equipped with vibration or heat sensors. Id. Sec. 1910.272(p)(4). Belts and lagging must have surface electrical resistance not to exceed 300 megohms. Id. Sec. 1910.272(p)(2).
 
 
 36
 Under the housekeeping provision of the final rule, 29 C.F.R. Sec. 1910.272(i), fugitive grain dust accumulations must be carefully controlled. In all grain facilities--both mills[17] and elevators--the employer is required to "develop and implement a written housekeeping program that establishes the frequency and method(s) determined best to reduce accumulations of fugitive grain dust on ledges, floors, equipment, and other exposed surfaces." Id. Sec. 1910.272(i)(1) (emphasis added).
 
 
 37
 In addition, grain elevators must initiate appropriate cleaning measures whenever dust accumulations reach a depth of 1/8 inch in any of three priority housekeeping areas: (1) floor areas within 35 feet of inside bucket elevators; (2) floors of enclosed areas containing grinding equipment; and (3) floors of enclosed areas containing grain dryers located inside the facility. Id. Sec. 1910.272(i)(2).[18] As an alternative to complying with this 1/8 -inch action level, the employer may develop and implement a housekeeping program that demonstrably provides the "equivalent protection." Id. Sec. 1910.272(i)(2)(ii).
 
 
 38
 The housekeeping component of the final standard contains several changes from the proposed standard; two are significant for this proceeding. First, the 1/8 -inch action level applies only in priority areas, not facility-wide as first proposed. OSHA agreed with those participants who argued that an objective action level was essential for effective and enforceable housekeeping, because it provides an objective measure of compliance. 52 Fed.Reg. 49,608-11 (1987). Without an objective measure, the new housekeeping provision might present enforcement problems similar to those that had been encountered under the old housekeeping standard (29 C.F.R. Sec. 1910.22(a)(1)) or the general duty clause (29 U.S.C. Sec. 654(a)(1)). 52 Fed.Reg. 49,611 (1987).
 
 
 39
 However, OSHA was persuaded that the proposed 200-square-foot average was also susceptible to problems of measurement and enforcement. Id. at 49,610-11. Moreover, the agency found that the greatest fire and explosion potential exists in and near the leg. Id. at 49,609-10. The agency therefore determined that the action-level requirement should focus on "priority areas," designated such because they contain a high concentration of ignition sources that cannot be effectively eliminated by the maintenance, engineering, and other controls required by the standard. Id. at 49,610. OSHA believed that by requiring cleanup whenever any accumulation in the priority area reaches 1/8 inch, the final action level would effectively reduce the total amount of grain dust in priority areas below what would have been allowed under the proposed rule.
 
 
 40
 A second basis of departure from the proposed standard was to apply the 1/8 -inch action level to grain elevators only, thereby excluding grain mills. OSHA's reasons, to be considered below in greater detail, were as follows: The evidence convinced OSHA that the vast majority of explosions in mills originate in the grinding equipment. Thus, OSHA reasoned, prevention of these primary explosions can be prevented by removal of foreign materials in the grain stream and by vigorous preventive maintenance. Id. at 49,613 (1987). OSHA also noted that mills are much cleaner than elevators because mills are subject to Food and Drug Administration (FDA) regulations requiring clean and sanitary operations where food and feed products are processed. Id. at 49,597, 49,613. See 21 C.F.R. Sec. 110.37. Finally, OSHA found that the wide range of additives which feed manufacturers use, particularly limestone and liquids, greatly reduce the ability of a grain mixture to generate combustible dust. 52 Fed.Reg. 49,613 (1987).
 
 
 41
 In another significant rulemaking determination, OSHA refused to exempt small elevators from the standard, concluding that the number of incidents, deaths, and injuries in small facilities, though lower than in large facilities, remained significant. OSHA found that the lower number of accidents did not reflect a reduced risk, since small elevators tend to operate, for the most part, only during harvest seasons. Id. at 49,598-99.
 
 
 42
 OSHA was persuaded by participants, however, that very small elevators (less than one-million-bushel storage capacity) would have difficulty absorbing the costs of engineering controls and that their small size made alternatives to those controls feasible. Id. at 49,600. Thus, small elevator operators were permitted to substitute daily visual inspection both for installation of the motion detection devices and for belt alignment monitoring devices otherwise required for bucket elevator legs. See id. at 49,599-601, 49,619; 29 C.F.R. Sec. 1910.272(p)(7).
 
 
 43
 OSHA estimated the standard's annual compliance cost at $5.7 million for mills, or less than one percent of after-tax profits. For elevators, the annual compliance cost was estimated at $35.7 to $63.1 million.[19] Broken down for each segment of the industry, compliance estimates for elevators represented 1.56 percent (for inland terminals) to 7.10 percent (for export terminals) of net income under a once-per-shift calculation, and 2.73 percent (for inland terminals) to 21.10 percent (for export terminals) of net income under a three-passes-per-shift alternative. OSHA concluded that compliance would occasion no significant changes in the ratios of total liabilities to net worth, current assets to current liabilities, or net income to equity for elevators.
 
 
 44
 III. Challenges to the Validity of the Standard.
 
 
 45
 A. Scope of Review.
 
 
 46
 The overall policy of the OSH Act is to "assure so far as possible ... safe and healthful working conditions" for every American worker. 29 U.S.C. Sec. 651(b). To that end, the Act authorizes OSHA to set "mandatory occupational safety and health standards," which are defined by section 3(8) as "practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. Sec. 652(8).
 
 
 47
 At least two provisions in the OSH Act limit OSHA's power to set protective standards. The first is section 3(8)'s requirement that the standard be "reasonably necessary or appropriate" to protect employee health or safety. Id. To comply with this requirement, OSHA must make a threshold showing that a significant risk of either health impairment or job safety exists and that the risk can be eliminated or reduced by the change which the standard will impose upon industry practices. Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 641-42, 100 S.Ct. 2844, 2863-64, 65 L.Ed.2d 1010 (1980) (plurality opinion); Forging Indus. Ass'n v. Secretary of Labor, 773 F.2d 1436, 1445-46 (4th Cir.1985) (en banc).
 
 
 48
 The second limitation is the Act's "feasibility" requirement, contained in section 6(b)(5):
 
 
 49
 The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life.... In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be ... the feasibility of the standards.
 
 
 50
 29 U.S.C. Sec. 655(b)(5) (emphasis added). Although section 3(8) does not contain an explicit feasibility requirement, the Supreme Court has stated that "any standard that [is] not economically or technologically feasible a fortiori would not be 'reasonably necessary or appropriate' under section 3(8)." American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 513 n. 31, 101 S.Ct. 2478, 2492 n. 31, 69 L.Ed.2d 185 (1981).
 
 
 51
 The feasibility requirement contained in section 6(b)(5)'s first sentence is not merely repetitive of the implied feasibility requirement of section 3(8). Section 6(b)(5) is an affirmative mandate as well as a limitation. Thereunder, the Secretary shall issue standards dealing with toxic materials or harmful physical agents to the extent feasible, that is, to the extent to which industry is "capable" of abating the hazard. American Textile, 452 U.S. at 508, 101 S.Ct. at 2490.
 
 
 52
 Thus, "[a]ny standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the command set forth by Sec. 6(b)(5)." Id. at 509. However, OSHA standards promulgated under provisions other than section 6(b)(5) are subject to cost-benefit justification under section 3(8)'s "reasonably necessary" language.[20] See Asbestos Information Ass'n/N. Am. v. OSHA, 727 F.2d 415, 423 (5th Cir.1984) (an emergency temporary standard "must, on balance, produce a benefit the costs of which are not unreasonable").[21]
 
 
 53
 Section 6(f) of the OSH Act, 29 U.S.C. Sec. 655(f), establishes substantial evidence as the standard for judicial review of OSHA's standards. Under the substantial evidence test, "we must take a 'harder look' at OSHA's action than we would if we were reviewing the action under the more deferential arbitrary and capricious standard applicable to agencies governed by the Administrative Procedure Act[, 5 U.S.C. 706]." Asbestos Information, 727 F.2d at 421 (footnote omitted).
 
 
 54
 The substantial evidence test applies both to OSHA's factual findings and to its essentially legislative policy decisions. Texas Indep. Ginners Ass'n v. Marshall, 630 F.2d 398, 404 (5th Cir.1980). For factual determinations, the Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Our review of factual findings, therefore, is not de novo. Even if the evidence supports inconsistent inferences, we will not displace the agency's choice so long as a reasonable person could reach that conclusion. Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1485 (D.C.Cir.1986).
 
 
 55
 For policy determinations, OSHA's decision must be scrutinized even though, unlike factual findings, it is not susceptible to verification or refutation by the record. Texas Indep. Ginners, 630 F.2d at 404. This scrutiny involves a two-pronged analysis: The Secretary's action must be found (1) consistent with the statutory language and purpose of the OSH Act, and (2) reasonable under the state of the record before her. Id. Where the agency's policy determinations are based upon complex scientific and factual data, or involve speculative projections, our review is particularly deferential. Forging Indus. Ass'n, 773 F.2d at 1443.
 
 
 56
 Armed with the foregoing principles, we review the union's petitions first, then the industry's. Their only commonality is challenge to the efficacy of the currently-mandated action level.
 
 
 57
 B. Union Challenges.
 
 
 58
 The unions contend that under section 6(b)(5) of the OSH Act, the Agency is required to devise a grain-handling-facilities standard that affords grain workers the maximum protection feasible. Instead, they argue, OSHA gave industry's compliance costs much more weight than does the balance struck by Congress. Specifically, the unions believe the final standard affords the employers discretion to provide only minimal protection. It requires all grain-handling facilities to develop their own written housekeeping plan, specifying the methods and frequency for "reducing" grain dust accumulation, but not "minimizing" it. No specific dust-control measures are required to be implemented. Nor is there any objective limit placed upon the amount of dust that may accumulate without violating the standard. The 1/8 -inch action level is not a specific limit on accumulations, but rather is merely a directive that an employer initiate clean-up operations whenever dust reaches the specified level.
 
 
 59
 The unions do not quarrel with the action-level concept, but would prefer it be implemented on a facility-wide basis. This would more effectively reduce the amount of dust available to fuel secondary explosions, in addition to controlling ignition in priority areas. The unions also argue that OSHA should impose a facility-wide action level in grain mills as well as grain elevators, or demonstrate why such a measure would not be feasible.[22]
 
 
 60
 1. The Meaning of "Harmful Physical Agents" Under Section 6(b)(5) of the OSH Act.
 
 
 61
 As a preliminary matter, we must decide whether an OSHA safety standard, regulating the incidence of physical injury from an immediate and obvious danger, must comply with the feasibility mandate contained in section 6(b)(5) of the OSH Act. All parties look to the Supreme Court's decision in American Textile Mfrs. Inst., Inc. v. Donovan as controlling authority. In that case, a coalition of industry groups challenged OSHA's cotton-dust standard,[23] which was promulgated to protect workers from byssinosis, a progressive respiratory disease caused primarily by the inhalation of cotton dust. Industry challenged the standard under both sections 3(8) and 6(b)(5) of the OSH Act, contending that the standard was neither reasonably necessary to protect workers, nor technologically or economically feasible to implement.
 
 
 62
 The District of Columbia Circuit sustained the standard in most major respects in AFL-CIO v. Marshall, 617 F.2d 636 (D.C.Cir.1979), aff'd in relevant part sub nom. American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). In so holding, that circuit rejected the approach taken by this circuit in American Petroleum Inst. v. OSHA, 581 F.2d 493 (5th Cir.1978), aff'd on other grounds sub nom. Industrial Union Dep't v. Am. Petroleum Inst., 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980), which had required OSHA to conduct a cost-benefit analysis in promulgating toxic substance standards under section 6(b)(5).
 
 
 63
 On writ of certiorari, the industrial petitioners placed the cost-benefit issue squarely before the Court, asserting that section 6(b)(5)'s "to the extent feasible" language necessarily implies some form of cost-benefit justification. The Court disagreed, holding that OSHA need not, indeed must not, consider cost-benefit criteria in setting toxic-substance standards. 452 U.S. at 506-22, 101 S.Ct. at 2489-97.[24] See also Building & Constr. Trades Dep't, AFL-CIO v. Brock, 838 F.2d 1258, 1264 (D.C.Cir.1988) ("[T]he [American Textile ] Court held that the 'feasibility' standard of Sec. 6(b)(5) does not require the Secretary to balance cost and benefit in defining a standard, and clearly manifested the Court's belief that the [OSH] Act did not permit the Secretary to do so.") (emphasis in original).
 
 
 64
 To reach this result, the Court employed a two-step analysis. First, it defined the statutory term "feasible" according to its common dictionary meaning--that which is "capable of being done, executed, or effected." 452 U.S. at 508-09, 101 S.Ct. at 2490-91 (quoting Webster's Third New Int'l Dictionary of the English Language at 831 (1976)). Thus, the Court reasoned that
 
 
 65
 Sec. 6(b)(5) directs the Secretary to issue the standard that 'most adequately assures ... that no employee will suffer material impairment of health,' limited only by the extent to which this is 'capable of being done.' In effect then, as the Court of Appeals held, Congress itself defined the basic relationship between costs and benefits, by placing the 'benefit' of worker health above all other considerations save those making attainment of this 'benefit' unachievable. Any standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress would be inconsistent with the command set forth in Sec. 6(b)(5). Thus, cost-benefit analysis by OSHA is not required by the statute because feasibility analysis is.
 
 
 66
 Id. at 509, 101 S.Ct. at 2490 (footnote omitted, emphasis added).
 
 
 67
 The Court next turned to the question of whether section 3(8)'s requirement that a standard be "reasonably necessary or appropriate" should be construed to impose cost-benefit constraints upon OSHA's rulemaking authority. Assuming arguendo that section 3(8) implies a cost-benefit justification, the Court nonetheless refused to read that requirement as overriding section 6(b)(5)'s feasibility mandate for standards that regulate toxic substances and harmful physical agents.
 
 
 68
 The Court reasoned that to hold otherwise would effectively eviscerate section 6(b)(5)'s "to the extent feasible" requirement: The level of risk deemed acceptable under cost-benefit criteria would never be lower--but rather, would typically be higher--than the level dictated by feasibility analysis. 452 U.S. at 513, 101 S.Ct. at 2492. Thus, where OSHA sets standards under section 6(b)(5), that section's feasibility mandate preempts any criteria, less protective of workers, that might be read into section 3(8).
 
 
 69
 One question expressly left open by the Court in American Textile is whether section 3(8) itself implies a cost-benefit justification for standards promulgated under enabling provisions other than section 6(b)(5). 452 U.S. at 513 n. 32, 101 S.Ct. at 2493 n. 32. Accordingly, OSHA presently contends that the rule before us is such a standard, since grain dust is neither a "toxic substance" nor a "harmful physical agent" under section 6(b)(5).
 
 
 70
 In making this argument, OSHA urges that the final clause of section 6(b)(5)'s first sentence makes abundantly clear that the section's coverage is limited to substances that take their toll over time or whose "deleterious effect is not readily apparent," such as a carcinogen or a harmful agent such as noise. The Secretary points to critical language in that clause requiring her to issue the standard designed to assure that "no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life." 29 U.S.C. Sec. 655(b)(5) (emphasis added).
 
 
 71
 The unions assert that OSHA's argument in plainly at odds with the plain text of section 9(b)(5): They assert that OSHA would have us rewrite the phrase "even if such employee has regular exposure to the hazard ... for the period if his working life" by eliminating the words "even if," a term of inclusion, and substituting in their place the phrase "only if," a term of exclusion. The Secretary, on the other hand, explains that the "even if" clause serves the purpose, not simply of adding a category of hazards with which the Secretary should be concerned, but of directing that when standards "dealing with toxic materials or harmful physical agents" are promulgated, they should be set at a level sufficiently low to protect all workers from the latent effects of exposure to such materials or agents, a factor not generally relevant to safety standards. There are Supreme Court pronouncements that can be read to support such a distinction.
 
 
 72
 In Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., a plurality of the Court asserted, in a footnote, that
 
 
 73
 [t]he reason that Congress drafted a special section for [toxic materials and harmful physical agents] was not ... because it was thought that there was a need for special protection in these areas. Rather, it was because Congress recognized that there were special problems in regulating health risks as opposed to safety risks. In the latter case, the risks are generally immediate and obvious, while in the former, the risks may not be evident until a worker has been exposed for long periods of time to particular substances. It was to ensure that the secretary took account of these long-term risks that Congress enacted Sec. 6(b)(5).
 
 
 74
 448 U.S. at 649 n. 54, 100 S.Ct. at 2867 n. 54 (emphasis added). Citing this footnote, the Court later stated in American Textile that "Congress could reasonably have concluded that health standards should be subject to different criteria than safety standards because of the special problems presented in regulating them." 452 U.S. at 512, 101 S.Ct. at 2492 (emphasis in original).
 
 
 75
 Whether Congress did in fact reach such a conclusion is not as clear as it might be in the legislative history, however. The legislative history upon which the Industrial Union plurality based its footnote was a single statement by Senator Dominick. This statement, moreover, like the first sentence of section 6(b)(5) itself, does not evince Congress' intention to exclude risks of immediate danger, but to include hazards occasioned by long-term exposure. The senator explained that Congress' intention in adopting section 6(b)(5) was to require the Secretary
 
 
 76
 to use his best efforts to promulgate the best available standards, and in so doing ... he should take into account that anyone working in toxic agents and physical agents which might be harmful may be subjected to such conditions for the rest of his working life, so that we can get at something which might not be toxic now, if he works in it a short time, but if he works in it the rest of his life might be very dangerous; and we want to make sure that such things are taken into consideration in establishing standards.
 
 
 77
 116 Cong.Reg. at 37,622-23 (quoted in Industrial Union, 448 U.S. at 648-49, 100 S.Ct. at 2867-68) (emphasis added).
 
 
 78
 Returning once again to the OSH Act itself, we note that Congress made no blatant effort to define or distinguish between health and safety standards. On the contrary, the third sentence of section 6(b)(5), which enumerates policy considerations for all section 6(b)(5) standards, arguably rejects such a distinction. It provides that
 
 
 79
 in addition to the attainment of the highest degree of health and safety protection for the employee other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws.
 
 
 80
 29 U.S.C. Sec. 655(b)(5) (emphasis added).
 
 
 81
 The sharp distinction apparently drawn in American Textile between health and safety standards is undercut, moreover, by statements elsewhere in the opinion that seemingly ignore it. For example, in discussing the feasibility requirement, the Court states that "[n]owhere is there any indication that Congress contemplated a different balancing by OSHA of the benefits of worker health and safety against the costs of achieving them." 452 U.S. at 521, 101 S.Ct. at 2496 (emphasis added). To support this statement, the Court cited congressional concern to protect workers from all types of occupational health and safety standards. Id. at 522, 101 S.Ct. at 2497.[25] The Court thus concluded that Congress intended employers to bear substantial costs "when necessary to create a safe and healthful working environment. Congress viewed the costs of health and safety as a cost of doing business." Id. at 521, 101 S.Ct. at 2496 (emphasis added; footnote omitted).[26] These statements, and the use of congressional authority, offer some support for the unions' view that Congress was concerned with protecting workers equally from both safety and health hazards, not merely the latter.
 
 
 82
 We are faced, therefore, with a statute and legislative history that are not as clear as they could be and with arguable inconsistent language from Supreme Court opinions. Our role in reviewing a regulation under such circumstances is set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984):
 
 
 83
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
 
 
 84
 'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.
 
 
 85
 'If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).
 
 
 86
 (Footnote and citations omitted). Thus, only where congressional intent is pellucid are we entitled to reject reasonable administrative construction of a statute. INS v. Cardoza-Fonseca, 480 U.S. 421, 447-48, 107 S.Ct. 1207, 1221-22, 94 L.Ed.2d 434 (1987). Where, on the other hand, an agency's interpretation is a reasonable reading of intent, we defer to it. See Brock v. Schwarz-Jordan, Inc., 777 F.2d 195, 198 (5th Cir.1985) (per curiam).
 
 
 87
 Were we to divine Congress's intent de novo in this matter, we might with some ease conclude that the better view is that Congress, if faced squarely with the issue, would have required OSHA to develop standards to assure worker safety equally as to both latent health hazards and hazards, such as explosives, that are every bit as lethal but whose impact is immediate. However, given the ambiguity visited here by Congress, and in the absence of a specific exposition by the Supreme Court, we defer to OSHA.
 
 
 88
 Accordingly, we hold that the immediate and obvious danger posed by grain dust in grain-handling facilities does not constitute a "harmful physical agent" within the contemplation of section 6(b)(5). OSHA thus was not subject to the feasibility mandate contained in that section in promulgating a standard to reduce or eliminate that danger.
 
 
 89
 Hence, the appropriate standard for OSHA is that its standard be "reasonably necessary or appropriate" to protect employee safety under section 3(8). This determination encompasses a specie of cost-benefit justification, as we explained in Asbestos Information Ass'n/N. Am. v. OSHA, 727 F.2d at 423 [ (5th Cir.1984) ].
 
 
 90
 The test under section 3(8) is an intermediate one between the feasibility mandate of section 6(b)(5) and a strict cost-benefit analysis that requires a more formal, specific weighing of quantified benefits against costs. Thus, in Asbestos we noted that an emergency temporary standard
 
 
 91
 must, on balance, produce a benefit the costs of which are not unreasonable.... [W]e do not imply that [the OSH Act] requires the agency to [conduct a formal cost-benefit analysis] before it promulgates [such a standard].... We cannot say that the cost of compliance is unreasonable if the [standard] in fact alleviates a grave danger.
 
 
 92
 Id. at 423-24 & n. 18. Similarly, in Texas Indep. Ginners [v. Marshall ] we concluded that
 
 
 93
 [t]he reasonably necessary requirement in [section 3(8) ] only demands that the expected costs of OSHA regulations be reasonably related to the expected benefits, leaving considerable discretion for the agency as long as it is exercised on substantial evidence and with an adequate statement of reasons.
 
 
 94
 630 F.2d at 411 n. 44 [ (5th Cir.1980) ].[27] ]
 
 
 95
 2. Scope of the Action Level: Priority Area or Facility-Wide?
 
 
 96
 OSHA must present a statement of reasons for its action, see 29 U.S.C. Sec. 655(e), and, as we have noted, "[i]t is axiomatic that the reasons the Agency gives at the time it acts form the basis for the Agency's action." Asbestos Information Ass'n, 727 F.2d at 425. However, because of our deferential review of OSHA's legislative-type policy decisions, we do not require the agency to respond in detail to every imaginable proposal for tighter standards. Instead, a party challenging an OSHA standard bears the burden of demonstrating that the agency's proposed standard is not "reasonably necessary or appropriate" to address the problem at hand.
 
 
 97
 OSHA here recognizes that dust accumulations of 1/8 inch are "by no means a 'safe' level for grain dust." 52 Fed.Reg. 49,611 (1987). The record is also replete with evidence that it is the secondary explosions that cause most of the deaths, injuries, and devastation, and that by controlling dust accumulations, the risk and magnitude of secondary explosions will be reduced. Id. at 49,607.
 
 
 98
 OSHA further acknowledges that potential ignition sources in elevators "cannot be readily identified and controlled with any certainty or comprehensiveness." Id. at 49,611. Nonetheless, the agency confines the 1/8 -inch action level to areas where ignition of grain dust, and hence primary explosions, are "most likely" to occur. Presumably, in areas where ignition is less likely, primary explosions will continue to occur. And when they do, the level of dust available throughout the facility to fuel the secondary explosion will depend, in large part, upon the initiative taken by the employer to minimize dust accumulations pursuant to its own housekeeping plan.[28]
 
 
 99
 As discussed, OSHA ultimately rejected its own initial proposal that would have imposed a 1/8 -inch action level over any 200-square-foot area in the entire facility. This proposal was rejected largely for reasons of administrative efficiency, although the agency made passing mention that the approach "could result in problems ... with economic feasibility...." Id. at 49,611. OSHA contends that the final standard embodies the optimal enforcement strategy because the boundaries of the priority areas are certain: If 1/8 inch has accumulated anywhere in the priority area, and the employer has not begun to remove the accumulation or reduce its combustibility, a citation may be issued. By contrast, the effectiveness of the 200-square-foot average was questionable, because of the self-evident uncertainty as to the boundaries of the area.
 
 
 100
 OSHA also concluded that the facility-wide scope of the proposal's action level, though superficially appealing, lacked focus on the most dangerous areas--the leg and dryer areas[29]--thus undercutting the efficacy of the action level.[30] The final action level requires clean-up whenever 1/8 inch accumulates in any part of the priority area, regardless of total amount.[31] The proposal, on the other hand, would not have required cleanup until sufficient dust had accumulated to cover a 200-square-foot area to a 1/8 -inch average depth. Thus, in the most hazardous priority areas, the final standard tolerates far less dust than would have been tolerated under the proposal and, during active periods, requires much more diligent housekeeping. See id. at 49,610.
 
 
 101
 Although OSHA's reasons convince us of the administrative unmanageability of a facility-wide action level based upon dust accumulation averaged over a 200-square-foot area, these enforcement problems could be circumvented by simply extending a strict action level to the entire facility. By extending, in effect, the priority areas to encompass the entire floor space of the facility, the potential boundary disputes evaporate. More importantly, a specific, objective criterion that mandates removal of dust throughout the entire facility presumably would both reduce the risk of ignition, as envisioned under the current standard, and reduce the amount of dust available to fuel a secondary explosion, should ignition occur.
 
 
 102
 As for technical considerations, evidently a facility-wide standard would require no more than a push broom. And as for cost, OSHA's preliminary estimate was $24 million for a facility-wide action level--clearly within the range of estimated net compliance costs under the current proposed standard ($5.9 million to $33.4 million). Id. at 49,622.
 
 
 103
 These factors lead us to conclude that extending the 1/8 -inch action level to the entire facility (without a 200-square-foot limitation) should have been considered by the Secretary. See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983); Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1507 (D.C.Cir.1986); 29 U.S.C. Sec. 655(e).
 
 
 104
 Accordingly, we remand for further consideration of this question. On remand, OSHA must consider, as an option, the adoption of a facility-wide standard. Of course, it must also explain its decision to utilize, or to reject, such a standard.
 
 
 105
 3. Scope of the Action Level: Should Grain Mills Also Be Made To Comply?
 
 
 106
 As mentioned above, OSHA imposed an action level for grain elevators but not for grain mills. For mills, OSHA believed it "possible to prevent primary explosions without imposing specific dust-accumulation limits in priority housekeeping areas, because the potential ignition sources can be identified and controlled." Id. at 49,613 (emphasis added).
 
 
 107
 Unlike grainelevator explosions, whose ignition sources OSHA concedes to be elusive, the vast majority of explosions in mills can be traced almost exclusively to the grinding equipment used in the facilities, and to the presence of tramp metal and other foreign materials, such as tools, which somehow enter the grain stream. The standard, therefore, controls these potential ignition sources by a combination of foreign-object screens,[33] general housekeeping, employee training, and preventive maintenance.
 
 
 108
 OSHA also points out that various differences between mill and grain elevator operations make mills less susceptible to fires and explosions. Mills typically operate at slower speeds and have smaller capacities than grain elevators. Because mills also generally run year-round with little seasonal change, maintenance of equipment is more systematic. Moreover, mills typically use a myriad of ingredients which, when mixed with grain, produce a significantly less flammable substance than raw grain dust.[34]
 
 
 109
 Finally, grain mills are already subject to stringent housekeeping and infestation standards enforced by other agencies.[35] Since these regulations are concerned both with keeping the feed from becoming adulterated by the work environment and with preventing cross contamination between batches of product, OSHA concludes that the cleaning procedures thus entailed will reduce the likelihood that grain dust will be allowed to accumulate anywhere in the facilities. Id.
 
 
 110
 The unions rely upon United Steelworkers of Am. v. Auchter, 763 F.2d 728 (3d Cir.1985), on motion to enforce judgment, 819 F.2d 1263 (3d Cir.1987), in arguing that OSHA improperly excluded grain mills from compliance with an action level comparable to that imposed upon grain elevators. In that case, OSHA found that all workers face a significant risk from the lack of information about chemical hazards, but that the risk is greater among workers in the manufacturing sector. For this reason, OSHA limited coverage of its hazard-communication standard to the manufacturing sector, excluding employees in such sectors as service, construction, and agriculture. Significantly, the record showed that some workers in those non-covered sectors had higher reported rates of chemical-source illness and injury than did workers in many covered industries. The court therefore remanded the standard for further consideration by the agency, holding that
 
 
 111
 [o]nce a standard has been promulgated ... the Secretary may exclude a particular industry only if [s]he informs the reviewing court, not merely that the sector selected for coverage presents greater hazards, but also why it is not feasible for the same standard to be applied in other sectors where workers are exposed to similar hazards.
 
 
 112
 763 F.2d at 738.
 
 
 113
 The unions accordingly contend that here, as in United Steelworkers, OSHA found that all grain industry workers face a similar hazard--i.e., physical injury from fire and explosions--but that those risks are greater among workers in a particular sector, grain elevators. Thus, the unions reason that OSHA should extend mill workers the same coverage, or explain why doing so would not be feasible.
 
 
 114
 Because we find United Steelworkers distinguishable from the case before us, we reject the unions' argument. Whereas in that case, OSHA totally excluded coverage to workers it had determined were at significant risk, here, by contrast, OSHA has afforded mill workers coverage that purportedly will eliminate the significant risk of fires and explosions in mills. The burden, therefore, remains on the unions to demonstrate that their proposal will both provide more than a de minimis benefit for mill worker safety and be feasible to implement. Since the unions have shown neither, we do not find that the Secretary has abused her discretion in refusing to mandate an action level for grain mills.
 
 
 115
 C. Industry Challenges.
 
 
 116
 The industry contends that OSHA's grain-handling-facilities standard is based upon erroneous cost-benefit calculations. We need not reach this argument, already having decided that section 6(b)(5) of the OSH Act preempts it. Once again, as the American Textile court observed, "cost-benefit analysis is not required by the statute because feasibility analysis by OSHA is." 452 U.S. at 509, 101 S.Ct. at 2490 (footnote omitted).
 
 
 117
 Otherwise, the industry raises two specific challenges: First, it argues that OSHA has failed to make the threshold showing, required under section 3(8) of the OSH Act, that the action-level component of its final standard will eliminate or reduce a significant risk. Second, it argues that the action level, in any event, is not economically feasible. We now address each of the industry's arguments in turn.
 
 
 118
 1. Reduction of Significant Risk.
 
 
 119
 Like the unions, industry builds upon OSHA's concession that 1/8 -inch is not a safe level for grain dust. If this is so, industry reasons, then what does a 1/8 -inch action level hope to accomplish? Industry points to the findings of the Factory Mutual Study, which demonstrated that dust accumulations (test medium was corn starch) of as little as 1/100 inch could fuel the spread of a flame front. This level, however, is unachievable, and industry thus concludes that OSHA should not set an action level at all.[36]
 
 
 120
 We are not persuaded by this argument. We find substantial evidence in the record that OSHA's choice of a 1/8 -inch action level for priority areas, although unable to eliminate the significant risk of grain elevator explosions, will substantially reduce that risk. See 52 Fed.Reg. 49,612 (1987). That is all section 3(8) requires.
 
 
 121
 Studies performed by USDA, NAS, NIOSH, and Kauffman and Hubbard uniformly agree that dust is fuel for fire and explosion and should be eliminated to the extent possible. The high concentration of uncontrollable ignition sources in and around grain elevator bucket legs provides abundant support for OSHA's conclusion that an especially intensive housekeeping effort is warranted for those priority areas.
 
 
 122
 Contrary to the industry's assertions, the record shows that the amount of layered dust is directly related to the risk in several respects. First, the greater the depth of layered dust in any enclosed space, the greater is the likelihood that it can produce ambient concentrations at explosive levels. Second, the greater the area within the facility covered with layered dust, the more likely it is that a confined space will be involved. Third, the more areas compromised by layered dust, the greater is the likelihood that a fire, primary explosion, or secondary explosion will harm an employee. And finally, the greater the ambient concentration of dust, the more severe is the explosion, because the total energy produced by combustion reflects the amount of available fuel.
 
 
 123
 To be sure, though one study cited by the industry does show that there is an upper limit on the amount of pressure (energy) which layered dust can produce when caused to mix with air and an ignition source, that finding does not nullify the very real relationship between the amount of layered dust and explosive energy below that ceiling.[37] OSHA need not await the "Godot of scientific certainty" while allowing workers to suffer. United Steelworkers of Amer. v. Marshall, 647 F.2d at 1266.
 
 
 124
 Based upon all of these considerations, OSHA concluded that 1/8 -inch was an appropriate limit because it is visible, measurable, and removable, and that the 1/8 -inch action level provides the objective measure of compliance necessary for effective guidance to the industry and effective enforcement by the agency. Finding this determination to be supported by substantial evidence, we will not displace the agency's choice.
 
 
 125
 2. Economic Feasibility.
 
 
 126
 A standard is economically feasible if industry's "long-term profitability and competitiveness" is not threatened. American Textile, 452 U.S. at 531 n. 55, 101 S.Ct. at 2501 n. 55. In reviewing OSHA's determination that compliance with the standard will not cause "serious economic dislocation" in entire industries, see AFL-CIO v. Brennan, 530 F.2d 109, 123 (3d Cir.1975), we "do not review [the agency's] cost figures de novo, but accord [the agency] discretion to arrive at a cost figure within a broad zone of reasonable estimate." Forging Indus. Ass'n v. Secretary of Labor, 773 F.2d 1436, 1453 (4th Cir.1985) (en banc) (quoting Weyerhaeuser v. Costle, 590 F.2d 1011, 1049 (D.C.Cir.1978)). The relevant inquiry, then, is "whether OSHA has constructed 'a reasonable estimate of compliance costs and demonstrate[d] a reasonable likelihood that these costs will not threaten the existence or competitive structure of an industry, even if it does portend disaster for some marginal firms.' " Id. (quoting United Steelworkers, 647 F.2d at 1272).
 
 
 127
 For its grain-handling-facilities standard, OSHA predicted that compliance costs could move as many as 183 grain elevators into negative net income.[38] However, since this figure represents less than one percent of all covered elevators, OSHA found the standard to be feasible.[39]
 
 
 128
 The industry does not challenge OSHA's conclusion as a matter of policy, but challenges, rather, the facts upon which it is based. Since the labor cost in complying with the action-level provision is the single most expensive item of compliance for grain elevators, the rate at which priority areas can be swept and vacuumed is critical to OSHA's prediction. The industry contends that OSHA significantly (by a factor of 5.4 to 1) understated the cost of compliance for grain elevators by applying an incorrect vacuuming and sweeping rate of 8,100 square feet per hour, and asserts that the proper cleaning rate is only 1,000 to 1,500 square feet per hour.
 
 
 129
 OSHA based its estimate of housekeeping labor costs upon two studies of vacuuming rates: A time-and-motion study of vacuuming in a factory setting, and an American National Standards Institute ("ANSI") study of carpet-sweeping. The time-and-motion study showed a vacuuming rate of 9,400 to 11,000 square feet per hour over an uncarpeted surface. The ANSI report, applying standard test methodology for relative work, showed a vacuuming rate of 6,480 square feet per hour over a carpeted surface with a 12-inch vacuum head. This translated into 1.8 linear feet per second.
 
 
 130
 OSHA determined that dust cleanup in priority areas would likely require a combination of vacuuming and sweeping, and that vacuums and push brooms could both be operated at 1.8 linear feet per second. Consequently, if a 24-inch push broom were applied over half an area, with subsequent vacuum removal of dust from the other half, it would be possible to clean at a rate of 9,720 square feet per hour.
 
 
 131
 However, OSHA further determined that 1.8 linear feet per second is an optimal rate and that the hourly average should be reduced from 9,720 to 8,100 to reflect less-than-optimal conditions in the workplace. The hourly average of 8,100 square feet then became the basis for OSHA's labor-cost computations.
 
 
 132
 The industry, on the other hand, relies upon findings contained in three studies for its 1,500-square-feet-per-hour rate. The first of these studies, the Arthur D. Little, Inc., Report, "Technical Feasibility and Economic Impact Analysis (EIA) for Various Standards Provisions Applicable to Hazards in Grain Handling Facilities" ("ADL Report"), commissioned by OSHA, found cleaning rates of 1,000-1,500 square feet per hour to be appropriate. ADL based these rates in part upon a series of 18 site visits to grain facilities to obtain empirical data on the typical dust control and other operating characteristics of such facilities. ADL also surveyed major vacuum-cleaner-equipment manufacturers to ascertain the rate and ability of vacuum equipment to clean grain dust. The ADL Report recognized inherent limitations upon the effectiveness of manual surface-cleaning techniques.
 
 
 133
 The next study, by Booz, Allen and Hamilton, entitled "Some Impacts of a Proposed OSHA Standard on Grain Handling Facilities" ("Booz-Allen Study"), also commissioned by OSHA, separately concluded that a cleaning rate of 1,500 square feet per hour for grain facilities was reasonable. The Booz-Allen Study based its estimates of surface areas to be cleaned, cleaning rates, and the number of work hours required to perform the cleaning operation upon the information compiled by ADL from the 18 site visits to facilities, and upon conversations with a technical consultant. Booz-Allen further confirmed the ADL figure through a panel discussion, supported by OSHA, of experts on various aspects of grain-handling operations.
 
 
 134
 The third study, commissioned by the National Grain and Feed Association and conducted by GEM Consultants, Inc., and Midwest Research Institute, "Evaluation of the Proposed OSHA Standard for Grain Handling" ("GEM-MRI Study"), further confirmed the same 1,500-square-feet-per-hour figure adopted by the earlier two studies. GEM-MRI, in addition to a detailed survey of 812 facilities, conducted site visits of some 38 facilities, and had the study's findings peer-reviewed by industry members.[40]
 
 
 135
 We have said that "[w]hen available evidence of equivalent quality is conflicting, a finding by [OSHA] in accordance with one view or the other should be considered to be supported by substantial evidence." Texas Indep. Ginners Ass'n, 630 F.2d at 405 (quoting American Petroleum Inst. v. OSHA, 581 F.2d at 507) (emphasis added). Here, we are confronted with conflicting evidence, and industry's position is that the studies it cites are of higher quality than those relied upon by the Secretary.
 
 
 136
 We agree. OSHA's estimates of cleaning rates in grain facilities are based upon studies of how fast one might be able to slide a vacuum across a floor or a carpet, without taking account of practical complications that might arise in an actual grain-elevator setting. Conversely, the industry's data is based upon empirical observation, which does address practical contingencies. Although we express no view as to the validity of the industry's evidence, and hence no opinion as to whether the agency underestimated the compliance costs of its standard, we do believe that industry has pointed to a significant factual gap in the record. We thus remand to the Secretary for reconsideration of the economic feasibility of the standard.
 
 
 137
 IV. Conclusion.
 
 
 138
 Based upon the foregoing, we REMAND this matter to the Secretary of Labor for reconsideration, in light of this opinion, of the economic feasibility of OSHA's grain-handling standard for grain elevator operators. The Secretary shall also consider whether the action-level component of its standard can be applied feasibly on a facility-wide basis to grain elevator facilities. Pending that review, enforcement of the 1/8 -inch action level requirement, 29 C.F.R. Sec. 1910.272(i)(2), shall be stayed.[41] Except as otherwise provided herein, the petitions are DENIED.
 
 
 139
 So ordered.
 
 
 140
 ON PETITION FOR REHEARING and SUGGESTION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 141
 The Secretary of Labor has petitioned for rehearing, asserting inter alia, that the panel opinion, supra, incorrectly holds that section 6(b)(5) of the Occupational Safety and Health Act of 1970, 29 U.S.C. Sec. 655(b)(5, applies to safety standards such as the instant proposed grain-dust regulations. Specifically, the Secretary points out that under, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984), and Brock v. Schwarz-Jordan, Inc., 777 F.2d 195, 198 (5th Cir.1985) (per curiam), we should have deferred to OSHA's reasonable interpretation of the statute rather than making our own determination. After reconsideration, we agree, in deference to the agency's interpretation, that section 6(b)(5) does not apply in any respect to this proceeding.
 
 
 142
 Also in her petition, the Secretary acknowledges that the panel properly remanded to require the Secretary to consider a facility-wide grain-dust standard but should have left the Secretary the latitude to consider various options on remand. We find that objection to be well-taken, as well.
 
 
 143
 Sections III.B.1 and III.B.2, supra, are hereby vacated, and in their place we substitute the sections set forth in the appendix hereto.* On remand, the Secretary shall apply, in all of the proceedings relative hereto, the analysis set forth in the revised sections. Our revised analysis applies as well, where appropriate, to those sections which we do not specifically vacate.
 
 
 144
 Accordingly, we REMAND this matter to the Secretary of Labor for reconsideration in light of such revised opinion. In all other respects, the petition for rehearing is DENIED. No member of this panel nor judge in regular active service having requested that the court be polled on rehearing en banc, the suggestion for rehearing en banc is DENIED. The mandate shall issue forthwith.
 
 
 
 [1]
 The grain-handling-facilities standard appears at 52 Fed.Reg. 49,62 4 (1987). The preamble to the standard appears at id. 49,592-624. For convenient reference, we shall cite the final standard by section number for Title 29 of the 1988 edition of the Code of Federal Regulations. The Secretary of Labor has delegated her authority to set standards under 29 U.S.C. Sec. 655 to the Assistant Secretary of Labor for Occupational Safety and Health, who is the head of OSHA. For purposes of this opinion, the words "Secretary," "agency," and "OSHA" are interchangeable
 
 
 [2]
 Unions that joined in a single petition opposing the standard are the Food & Allied Service Trades Department, AFL-CIO; the American Federation of Grain Millers; the United Food & Commercial Workers International Union; the Retail, Wholesale & Department Store Union; the Transportation-Communications International Union; the Allied Industrial Workers of America International Union; and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. An intervention petition was also filed by the Oil, Chemical & Atomic Workers International Union (OCAW). Since each union group adopts the other's petition, we will refer to all union groups simply as "the unions."
 
 
 [3]
 Intervention briefs were filed separately by the American Feed Industry Association and the Millers' National Federation
 
 
 [4]
 Grain elevator operators that joined together in a single petition are members of the National Grain and Feed Association, a voluntary association of grain and feed companies. Its 1,300 members include country elevator operators, terminal elevator operators, processors, and exporters. There are 42 state and regional grain and feed associations affiliated with NGFA, representing more than 10,000 grain and feed companies nationwide. Additionally, an amicus curiae brief was filed by the North Dakota Grain Dealers Association. This opinion will refer to all grain elevator operator representatives as the "industry."
 
 
 [5]
 The Act places a general duty upon employers to "furnish to [their employees] employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees." 29 U.S.C. Sec. 654(a)(1). The general industry housekeeping standard provides that "all places of employment, passageways, storerooms, and service rooms shall be kept clean and orderly and in a sanitary condition." 29 C.F.R. Sec. 1910.22(a)(1) (1987)
 
 
 [6]
 See, e.g., Ralston-Purina Co., 9 BNA OSHC p 2165 (ALJ 1981) (no duty to reduce grain dust exists where the Secretary fails to prove that certain dust accumulation posed a hazard); Bunge Corp., 7 BNA OSHC p 1654 (ALJ 1979) (no duty to provide dust collection where Secretary fails to provide measurements showing the presence of explosive quantities of dust); Archer-Daniels Midland Co., 8 BNA OSHC p 1537 (ALJ 1980) (Secretary failed to prove presence of explosive quantities of dust); Valley Center Farmers Elevator, 8 BNA OSHC p 1061 (ALJ 1979) (Secretary failed to prove presence of explosive quantity of dust); Cargill, Inc., 7 BNA OSHC p 2114 (ALJ 1979) (Secretary failed to prove that dust accumulation of 1/8 - 1/4 inch was recognized by industry as hazardous)
 
 
 [7]
 As currently defined in the final standard, "fugitive grain dust" means "combustible dust particles emitted from the stock handling system, of such size as will pass through a U.S. Standard 40 mesh sieve (425 microns or less)." 29 C.F.R. Sec. 1910.272(c)(2)
 
 
 [8]
 The LEL range, according to 1961 United States Bureau of Mines data for some common agricultural dusts, is from 35 to 290 g/m[3]. See R. Strehlow, Prevention of Grain Elevator and Mill Explosions, 113, 115-18 (NAS 1983) (hereinafter cited as NAS Report).
 
 
 [9]
 A milling facility, like an elevator, typically contains a number of bulk conveyors and bucket elevators. But, in contrast, feed mills move grain more slowly than elevators, grinding and blending it with at least equal amounts of protein concentrates, food by-products, vitamins, drugs, and minerals. 52 Fed.Reg. 49,597 (1987)
 
 
 [10]
 See also NAS Report at 15, 32, 47. The NAS Report made a number of recommendations, ranked from high to low priority, to reduce the frequency and severity of explosions. First-priority recommendations included continuing research on dust concentrations in legs, establishment of a housekeeping program, preventive maintenance program, permit procedures for hot work (such as welding or torch cutting), implementation of a system for indicating belt slippage and misalignment, a method to check the temperature and vibration of bearings, a means of extracting foreign materials from grain, and the grounding of conveying and electrical equipment. The NAS recommended that these first-priority measures be implemented industry-wide. Id. at 10-11
 
 
 [11]
 Executive Order No. 12,291 provides that to the extent permitted by law, regulations of agencies within the executive branch must comply with certain substantive requirements. The order requires agencies to consider cost-benefit analysis, cost effectiveness, maximization of benefit to society, condition of the regulated industries, and condition of the national economy. Id. Sec. 2. Moreover, the Order requires agencies to prepare a "Regulatory Impact Analysis," a document evaluating the proposed regulations in light of the foregoing substantive requirements. This analysis must be sent to OMB. Id. Sec. 3. Finally, agencies must defer final action until they have responded to OMB's comments. Id. Sec. 3(f)(1)
 
 
 [12]
 Although OSHA had rejected most of OMB's suggestions, it included in the proposal the two action-level alternatives suggested by OMB, because the alternatives in the proposed standard were expected to facilitate a broad comprehensive discussion of this issue through written comments and public hearings
 
 
 [13]
 Storage capacities of grain elevators vary widely. There are about 13,200 country elevators, defined as those elevators with a storage capacity of less than 2 million bushels and a throughput ratio of less than 3. Total storage capacity of all country elevators is about 7.1 billion bushels, and employment is estimated at 70,800 full-time equivalent employees, or 5.4 employees per facility. Country elevators primarily provide storage and purchasing services to farmers in their immediate areas. They may also provide services such as grain cleaning, drying, and blending (collectively known as grain conditioning). The country elevator business is highly competitive and localized. These operations are primarily owned by individual family corporations or partnerships, farmer cooperatives, or large companies that own a network of facilities
 By comparison, inland-terminal elevators and export-terminal elevators are large. There are about 450 inland-terminal elevators, with total storage capacity of approximately 1.5 billion bushels, or 3.4 million bushels per facility. The total employment in this sector is estimated at 6,100 full-time equivalent employees, or about 12.4 full-time employees and 8.3 part-time employees per establishment. Even larger still are export-terminal elevators, with a total storage capacity of 370 million bushels, or about 5.0 million bushels per facility. Facilities of this type with capacities of 10.0 million bushels are not unknown. On average, an export elevator will employ 55.4 full-time employees and 11 part-time employees. 52 Fed.Reg. at 49,620 (1987).
 
 
 [14]
 USDA records for the period 1959 through 1982 show that incident rates tend to be consistent over time, although irregularly-spaced catastrophes must be expected. For example, during 1958 through 1974, grain-dust explosions averaged 10 to 11 per year. But in 1967 there were 17 explosions; 1968, 16; 1974, 15; 1976, 22; and 1977, 21. Similarly, National Fire Protection Association records for 1958 through 1975 show grain fires averaged 2,000 to 3,000 per year, but that in 1968 and 1969, there were 5,300 and 4,700, respectively. See NAS Report at 14
 
 
 [15]
 In addition to fire and explosion prevention, the grain-handling facilities standard also regulates such hazards as suffocation in moving grain, exposure to toxic pesticides and other chemicals, and exposure to dangerous machinery. The requirements of the grain industry standard are also supplemented by other general industry standards. Cf. Brock v. Williams Enterprises, Inc., 832 F.2d 567, 569-70 (11th Cir.1987)
 
 
 [16]
 Under the standard, "jogging" means repeated starting and stopping of drive motors in an attempt to free a bucket conveyor belt that has become jammed by an excess of grain in the boot. 29 C.F.R. Sec. 1910.272(c)(6)
 
 
 [17]
 The term "mills," as used in this opinion, refers to feed mills, flour mills, rice mills, dust pelletizing plants, dry corn mills, soybean flaking operations, and the dry grinding operations of soycake. See 29 C.F.R. Sec. 1910.272(b)
 
 
 [18]
 OSHA recommends any of several methods for controlling dust emissions; being performance-oriented, the standard mandates no particular one. One such method is to install a pneumatic dust-collection system. However, as OSHA points out, the installation of a poorly-designed pneumatic system has been known to foster a false sense of security and has often led to an inappropriate reduction in manual housekeeping. Aspiration of the leg, as part of a pneumatic dust-collection system, is another effective method of controlling dust emissions. (Aspiration of the leg consists of a flow of air across the entire boot, which entrains the liberated dust and carries it up the up-leg to take-off points.) With proper aspiration, dust concentrations in the leg can be lowered below the LEL
 Another method of controlling dust emissions is enclosing the conveying system, pressurizing the general work area, and providing a lower pressure inside the enclosed conveying system. Although OSHA maintains that this method is effective in controlling dust emissions from the conveying system, adequate access to the inside of the enclosure is necessary to facilitate frequent removal of dust accumulations. This is also necessary for those systems called "self-cleaning." Finally, the use of edible oil sprayed on or into a moving stream of grain is yet another method which OSHA recommends to control dust emissions. 52 Fed.Reg. 49,612 (1987).
 
 
 [19]
 The lower figure assumes one cleaning pass per shift in priority areas; the higher figure assumes three cleaning passes per shift in priority areas
 
 
 [20]
 OSHA is authorized to issue three types of occupational safety and health standards, other than Sec. 6(b)(5) standards: Under Sec. 6(a), 29 U.S.C. Sec. 655(a), OSHA is authorized to promulgate, as an occupational safety or health standard, any national consensus standard or any established federal standard. Under Sec. 6(c), 29 U.S.C. Sec. 655(c), OSHA may issue emergency temporary standards
 
 
 [21]
 See also Donovan v. Castle & Cooke Foods, 692 F.2d 641, 647-49 (9th Cir.1982)
 
 
 [22]
 In a separate brief filed by OCAW, which brief has been adopted by all other union parties, the argument is made that the standard deserves remand because OMB allegedly displaced the Secretary's congressionally-authorized role in formulating it. OCAW's brief tells a colorful tale of "the behind-the-scenes evolution of OSHA's standard." Acting under Executive Order No. 12,291, OMB is said to have "made it clear at the outset of the proceeding that it would not authorize the Secretary to issue any grain dust standard that imposed a strict, facility-wide limit on grain dust accumulation or that required facilities, other than grain elevators, to comply with any specified limits on dust accumulation."
 The record, however, belies this contention. OMB's recommendations did not become part of the final rule; most were rejected before OSHA published its proposed rule. Moreover, there is no merit to OCAW's claim that OMB has obstructed judicial reviews by this court by means of its alleged off-the-record coercion of OSHA. The agency's final rule must stand or fall on the basis of the record before the agency, not on the basis of some "secret record" of OMB's.
 
 
 [23]
 29 C.F.R. Sec. 1910.1043 (1980)
 
 
 [24]
 The court defined cost-benefit analysis as a "systematic enumeration of all benefits and all costs, tangible and intangible, whether readily quantifiable or difficult to measure, that will accrue to all members of society if a particular project is adopted." 452 U.S. at 506 n. 26, 101 S.Ct. at 2489 n. 26 (quoting E. Stokey & R. Zeckhauser, A Primer for Policy Analysis at 134 (1978)). See also Bangser, An Inherent Role for Cost-Benefit Analysis in Judicial Review of Agency Decisions: A New Perspective on OSHA Rulemaking, 10 B.C. Envtl.Aff.L.Rev. 365, 373-76 (1982) (differentiating "monetized" cost-benefit analysis, which converts all costs and benefits to identical units, from the broader "integrative" cost-benefit analysis, which is at least partly subjective and attempts to consider non-economic social values)
 
 
 [25]
 For example, the Court quoted the following remark by Senator Eagleton:
 Whether we, as individuals, are motivated by simple humanity or by simple economics, we can no longer permit profits to be dependent upon an unsafe or unhealthy worksite.
 452 U.S. at 522, 101 S.Ct. at 2497 (quoting 116 Cong. Rec. 41,764 (1970)). The Court also cited other statements by members of Congress who, though not expressly mentioning both safety and health, did speak of OSHA standards in general rather than a special category of standards addressing long-term health risks. For example, the Court quoted this remark by Senator Dent:
 Although I am very much disturbed over adding new costs to the operation of our production facilities because of the threats from abroad, I would say there is a greater concern and that must be for the production men who do the producing--the men who work in the service industries and the men and women in this country who daily go out and keep the economy moving and make it safe for all of us to live and to work and to be able to prosper in it.
 Id. at 521 n. 39, 101 S.Ct. at 2496 n. 39 (quoting 116 Cong. Rec. 38,38 6 (1970)).
 
 
 [26]
 As underpinning for this statement, the Court quoted the following statement by Senator Yarborough:
 One may well ask too expensive for whom? Is it too expensive for the company who for lack of proper safety equipment loses the services of its skilled employees? Is it too expensive for the employee who loses his hand or leg or eye-sight? Is it too expensive for the widow trying to raise her children on meager allowance under workmen's compensation and social security? And what about the man--a good hardworking man--tied to a wheel chair or hospital bed for the rest of his life? That is what we are dealing with when we talk about industrial safety.
 Id. 452 U.S. at 520-21, 101 S.Ct. at 2496-97 (quoting 116 Cong. Rec. 37,625 (1970)).
 
 
 [27]
 We reject OCAW's suggestion that American Textile is to the contrary. There, the Court focused upon whether the first sentence of Sec. 6(b)(5) requires the Secretary to determine that costs bear a reasonable relationship to benefits. See 452 U.S. at 506, 101 S.Ct. at 2489. While holding that the Secretary is not so required, the Court made it clear that it was not deciding whether Sec. 3(8) by itself contemplates "some form of cost-benefit analysis." Id. at 512, 101 S.Ct. at 2492. Later, in Asbestos, we determined that at least some form of cost-benefit analysis was appropriate
 
 
 [28]
 The final standard does not require that employers implement housekeeping designed to "minimize" grain dust accumulations throughout the facility, as the proposed standard would have required. Rather, the word "minimize" was deleted from the final standard, which requires, instead, that the program be one determined by the employer to be "best" suited to "reduce" dust accumulations. See 29 C.F.R. Sec. 1910.272(i)(1). The record reflects that this change was made to avoid confusion and to emphasize operational flexibility. 52 Fed.Reg. 49,608-10 (1987)
 
 
 [29]
 Both the unions and industry note, and OSHA concedes, that grain elevators generally do not contain grinding equipment. The reason OSHA addressed grinding equipment in the priority area was that at least one rulemaking participant testified that he had placed grinding equipment in a grain elevator. OSHA chose to respond to this unusual situation by inclusion rather than exclusion, a policy decision clearly within OSHA's wide discretion
 
 
 [30]
 In establishing priority areas around unenclosed equipment, OSHA believed it important to ensure "a minimum distance between ... the location of potential ignition sources and dust accumulations (which can provide the fuel for a fire or explosion)." 52 Fed.Reg. 49,610 (1987) (emphasis added). Since separation of ignition sources from a fuel supply is not unique to this standard, OSHA utilized the 35-foot distance that has proved effective in other contexts, such as welding operations
 The unions criticize the 35-foot zone around the leg as "illogical" but offer no evidence to show what other boundary would have been safer. Setting a boundary for priority areas is the kind of decision best left to the agency's expertise and discretion. See Building & Constr. Trades Dep't, 838 F.2d at 1271.
 
 
 [31]
 OSHA apparently assumes that, with additional focus on the priority areas, most grain elevators will maintain such areas well below the 1/8 -inch level. We seriously doubt the reliability of that assumption
 
 
 [33]
 Section 1910.272(j) requires grates at receiving pits, and Sec. 1910.272(m) requires additional means of removing ferrous material from all grain-stream processing equipment such as hammer mills, grinders, and pulverizers
 
 
 [34]
 Some of the ingredients are inert fire retardants, such as limestone and benitonite. Other non-explosive and non-flammable ingredients include salt, dicalcium phosphate, monocalcium phosphate, and trace minerals. Feed mills also use a large number of non-flammable liquid ingredients such as molasses, mineral oil, and water-soluble ingredients that further reduce the explosiveness and flammability of the grain and its dust-generation potential. The pelleting process commonly used in feed manufacturing necessitates the inclusion of steam or water to the ingredients, further reducing the risk of explosion and fire. 52 Fed.Reg. 49,597 (1987)
 
 
 [35]
 Feed mills are subject to the good manufacturing practice (GMP) and inspection requirements of the FDA, which pervasively regulates the processing of animal feed. FDA's GMP requirements apply to the manufacture of both medicated and non-medicated animal feeds. 21 C.F.R. Sec. 225.1(b)(1) (1987). Feed manufacturers are required to maintain a clean facility, id. Sec. 225.20(b)(3); and clean equipment, id. Sec. 225.30(b)(2); and to produce feed that has no carryover or contamination from one product to another, id. Sec. 225.65. These requirements are enforced through rigorous governmental inspections. See 21 U.S.C. Sec. 374(a)
 
 
 [36]
 Industry relies heavily upon the Supreme Court's Industrial Union opinion. The plurality held in that case that, before OSHA can regulate a toxic substance, the agency must show that a significant risk of health impairment presently exists and that the risk can be eliminated or reduced as a result of industry's compliance with the proposed standard. 448 U.S. at 641-42, 100 S.Ct. at 2863-64. The Court reached that holding through a construction of Sec. 3(8) of the OSH Act, 29 U.S.C. Sec. 652(8), reasoning that for a standard to be "reasonably necessary ... to provide safe or healthful employment" under Sec. 3(8), OSHA must show that the work-site condition it seeks to regulate is unsafe. The Court then concluded that OSHA had failed to carry its burden. OSHA had merely assumed that there was no safe level for benzene exposure, and thus, reduction of then-current levels from 10 ppm to 1 ppm would reduce a risk. The Court thus affirmed that the petition for review be remanded to the Secretary to determine whether 10 ppm of benzene was indeed unsafe. 448 U.S. at 652-62, 100 S.Ct. at 2869-74
 Here, by contrast, there is no dispute that a 1/8 -inch accumulation of grain dust is unsafe. Further, the standard does not tolerate this level of accumulation but requires the employer to begin removing it, and thus reducing it to negligible levels, if and when a 1/8 -inch accumulation is present in priority areas.
 
 
 [37]
 See United Steelworkers, of America v. Marshall, 647 F.2d 1189, 1260 (D.C.Cir.1980) (OSHA's inability to cite to single correlation formula did not destroy OSHA's theory of a rational correlation between air-lead and blood-lead levels)
 
 
 [38]
 OSHA actually anticipated that no more than 77 to 129 elevators would have a negative income as a result of compliance costs, given that, on average, elevators already comply with many aspects of the new standard and therefore will not incur an additional 100 percent of the costs associated with the new standard. However, for purposes of a "worst case" scenario, OSHA assumed that elevators in bad financial condition were also totally out of compliance with the new standard
 
 
 [39]
 OSHA found that approximately 16 percent of country elevators were already in a negative bracket before the effective date of the standard. Accordingly, OSHA did not include these facilities in its feasibility calculations, since their bankrupt status would not be induced by costs of compliance
 
 
 [40]
 The record contains additional empirical evidence of cleaning rates in actual grain facilities. Another study in the record, based upon evidence obtained from 20 site visits of feedmill operations, suggests that the cleaning rate of 1,500 square feet per hour could be an overly optimistic estimate of cleaning efficiency. A study conducted by the T.E. Stivers engineering firm for the American Feed Manufacturers Association estimated that the average small feed facility would have to hire the equivalent of an additional two-thirds of a worker to sweep a facility once per shift. See An Economic Impact Study of Proposed OSHA Grain Handling Facilities Standard at 6. With a normal 8-hour shift and an average floor area of 4,000 square feet (from Booz-Allen Study at I-53), this estimate suggests an average cleaning rate of only about 750 square feet per hour
 
 
 [41]
 The salutary impact of grain dust standards upon worker safety suggests that immediate implementation of the standards--even at the levels proposed by the agency--would be desirable. A stay is called for, however, unless and until economic feasibility can be established, as the law requires
 
 
 *
 The appendix has been omitted as these changes were incorporated in the opinion at pp. 729-35